56 P.3d 734

**Benjamin KAMAUNU, Plaintiff–Appellee,**

v.

**Garth KAAEA, Defendant–Appellant.**

No. 22852.

Intermediate Court of Appeals of Hawai'i.

March 28, 2002.

Certiorari Granted April 23, 2002.

Randall Y.S. Chung, Thomas Tsuchiyama, Daniel C.H. Fong, and Ward F.N. Fujimoto, Honolulu, (Matsui Chung Sumida & Tsuchiyama), on the briefs, for defendant-appellant.

Richard L. Rost, Wailuku, (Law office of Richard L. Rost, attorney at law), on the briefs, for plaintiff-appellee.

BURNS, C.J., WATANABE, and FOLEY, JJ.

Opinion of the Court by WATANABE, J.

This appeal stems from a judgment entered by the Circuit Court of the Second Circuit[1] (the circuit court), following a trial *de novo* requested by Defendant–Appellant Garth Kaaea (Defendant) after an arbitrator appointed under the Court Annexed Arbitration Program (CAAP)[2] rendered an award in favor of Plaintiff–Appellee Benjamin Kamaunu (Plaintiff).

---

1. Although the Honorable Shackley F. Raffetto presided over the proceedings below, the judgment was signed by Second Circuit District Judge Rhonda I.L. Loo.

2. The Court Annexed Arbitration Program (CAAP) was established pursuant to Hawaii Revised Statutes (HRS) § 601–20 (1993), which provides as follows:

   **Court annexed arbitration program.** (a) There is established within the judiciary a court annexed arbitration program which shall be a mandatory and nonbinding arbitration program to provide for a procedure to obtain prompt and equitable resolution of certain civil actions in tort through arbitration. The supreme court shall adopt rules for the implementation and administration of the program by January 1, 1987.

   (b) All civil actions in tort, having a probable jury award value, not reduced by the issue of liability, exclusive of interest and costs, of $150,000 or less, shall be submitted to the program and be subject to determination of arbitrability and to arbitration under the rules governing the program. The rules shall include a procedure to classify and establish the order of priority according to which the actions will be processed for the determination of arbitrability and for the arbitration under the program. The court may, at its discretion, remove any action from the program.

   (c) The chief justice may hire on a contractual basis, and at the chief justice's pleasure remove, without regard to chapters 76 and 77, an arbitration administrator, who shall be responsible for the operation and management of the program, and such other persons deemed necessary for the purposes of the program in the judgment of the chief justice.

   Pursuant to Rule 34 of the Rules of the Circuit Courts of the State of Hawai'i (RCCH), the Hawai'i Arbitration Rules (HAR) attached to the RCCH as Exhibit A "shall govern the [CAAP] in the circuit courts of this state[.]" HAR Rule 8, entitled "Determination of Arbitrability[,]" provides generally that "[t]he court shall view all tort cases as arbitration eligible and automatically 'in' the [CAAP] unless plaintiff certifies that his or her case has a value in excess of the jurisdictional amount of the [CAAP] which is $150,000." HAR Rule 8(A).

Defendant contends that the circuit court: (1) abused its discretion when it ordered default to be entered against him on the issue of liability, as a sanction for not offering a monetary settlement to Plaintiff (default liability sanction); (2) wrongly used the CAAP arbitrator's award to apportion Defendant's negligence liability (apportionment sanction); (3) improperly deprived him of a jury determination as to Plaintiff's contributory negligence under Hawaii Revised Statutes (HRS) § 663–31 (1993)[3]; (4) erred in allowing Dr. James Ferrier (Dr. Ferrier), an orthopedic surgeon who treated Plaintiff in the emergency room at Maui Memorial Hospital, to testify at trial regarding Plaintiff's medical expenses because Plaintiff's "answers to interrogatories had not been seasonably supplemented with expert disclosures as required by [Hawai'i Rules of Civil Procedure (HRCP)] Rule 26(e)"; and (5) erred in denying his motion for a directed verdict, since Plaintiff failed to meet his burden of proving, through expert testimony, that his medical-rehabilitative expenses were reasonable and necessary and met the tort threshold requirements of HRS § 431:10C–306 (Supp.1998).

We agree with Defendant's first three contentions. Accordingly, we vacate the judgment and orders which prompted this appeal and remand this case for a new trial. We reject Defendant's fourth contention because the state of the record on appeal precludes us from determining its merits. As to Defendant's final contention, the record indicates that the circuit court's denial of Defendant's motion for directed verdict was premised partly on the circuit court's ruling that Plaintiff did not need to establish the reasonableness and necessity of his medical-rehabilitative expenses since the circuit court's order entering default against Defendant on the liability issue was determinative of that issue. In light of our vacature of the order of default, we vacate the circuit court's order denying directed verdict.

## BACKGROUND

At about 10 o'clock on the evening of June 20, 1997, Plaintiff walked to the middle of Kamehameha Avenue in Kahului, Maui, leaned over to pick up a quarter he thought he had seen, and was struck by a motor vehicle operated by Defendant. Plaintiff does not recall checking for cars prior to venturing onto the road, and he admits that he was intoxicated and wearing dark clothing at the time.

Although Defendant saw Plaintiff immediately prior to the impact, Defendant admits that he did not sound the horn of his vehicle. Instead, he swerved the vehicle to the left to avoid hitting Plaintiff and did not step on the brakes until after the impact. Although it is unclear whether there were any street lights in the vicinity, it is undisputed that the headlights on Defendant's vehicle were operational at the time.

3.  HRS § 663–31 (1993) provides:
    **Contributory negligence no bar; comparative negligence; findings of fact and special verdicts.** (a) Contributory negligence shall not bar recovery in any action by any person or the person's legal representative to recover damages for negligence resulting in death or in injury to person or property, if such negligence was not greater than the negligence of the person or in the case of more than one person, the aggregate negligence of such persons against whom recovery is sought, but any damages allowed shall be diminished in proportion to the amount of negligence attributable to the person for whose injury, damage or death recovery is made.
    (b) In any action to which subsection (a) of this section applies, the court, in a nonjury trial, shall make findings of fact or, in a jury trial, the jury shall return a special verdict which shall state:

(1) The amount of the damages which would have been recoverable if there had been no contributory negligence; and
(2) The degree of negligence of each party, expressed as a percentage.
(c) Upon the making of the findings of fact or the return of a special verdict, as is contemplated by subsection (b) above, the court shall reduce the amount of the award in proportion to the amount of negligence attributable to the person for whose injury, damage or death recovery is made; provided that if the said proportion is greater than the negligence of the person or in the case of more than one person, the aggregate negligence of such persons against whom recovery is sought, the court will enter a judgment for the defendant.
(d) The court shall instruct the jury regarding the law of comparative negligence where appropriate.

## PROCEDURAL HISTORY

On September 8, 1997, Plaintiff filed a complaint in the circuit court, alleging that "Defendant was negligent and careless in the operation of his motor vehicle" and seeking damages for the personal injuries sustained by Plaintiff as a result of the collision. Defendant's answer and demand for jury trial were filed on November 20, 1997, and on March 16, 1998,[4] a CAAP arbitrator was apparently appointed to arbitrate the case.

On July 20, 1998, the circuit court filed a Notice of Trial Date, informing the parties that trial on Plaintiff's complaint was set for 8:30 a.m. on Monday, December 14, 1998. Attached to the Notice of Trial Date was a Pretrial Order that scheduled a settlement conference for Wednesday, November 25, 1998, at 3:30 p.m., reminded the parties that their compliance with the terms and conditions of Rules of the Circuit Courts of the State of Hawai'i (RCCH) Rule 12.1 was mandatory, and directed the attention of counsel for the parties to the following specific requirements "of Rule 12.1 which will be inquired into at the settlement conference":

(d) Prior to the day of the settlement conference has each attorney thoroughly evaluated the case and personally discussed and attempted in good faith to negotiate a settlement. Rule 12.1(b)(4).

(e) Prior to the day of the settlement conference has each attorney exchanged a written bona fide and reasonable offer of settlement. Copies of each such offer of settlement and response shall be attached to the Settlement Conference Statement. Rule 12.1(a)(4).

The CAAP arbitration was held on August 3, 1998, and on August 21, 1998, the arbitrator issued an award, determining that Plaintiff was thirty-five percent negligent, Defendant was sixty-five percent negligent, and Plaintiff sustained $21,000.00 in special damages and $31,000.00 in general damages, for a combined total of $52,000.00. On September 4, 1998, Defendant filed a notice of appeal from the arbitrator's award and a request for trial *de novo* pursuant to Hawai'i Arbitration Rules (HAR) Rule 22.[5]

Plaintiff filed a Motion to Continue Trial on October 22, 1998, explaining that he needed "additional time to complete discovery by securing the opinions of an accident reconstruction expert who is scheduled to be on Maui in early November, 1998." Defendant did not object to the continuance, and on December 9, 1998, the circuit court entered an order continuing trial until May 3, 1999 and resetting the settlement conference to April 9, 1999.

On March 3, 1999, Defendant filed his Settlement Conference Statement and articulated his defenses and the settlement posture of the case as follows:

### IV. DEFENSES

Defendant believes that the evidence will show that Plaintiff's negligence was the primary cause of his injuries. In particu-

---

4. An order appointing a CAAP arbitrator to decide Plaintiff–Appellee Benjamin Kamaunu's (Plaintiff) case is not contained in the record on appeal. However, Plaintiff's pretrial statement represents that "an arbitrator was not appointed in the [CAAP] until March 16, 1998."

5. HAR Rule 22 provides, in relevant part, as follows:

**REQUEST FOR TRIAL *DE NOVO*.**

(A) Within twenty (20) days after the award is served upon the parties, any party may file with the clerk of the court and serve on the other parties and the Arbitration Administrator a written Notice of Appeal and Request for Trial *De Novo* of the action....

(B) After the filing and service of the written Notice of Appeal and Request for Trial *De Novo*, the case shall be set for trial pursuant to applicable court rules.

(C) If the action is triable by right to a jury, and a jury was not originally demanded but is demanded within ten (10) days of service of the Notice of Appeal and Request for Trial *De Novo* by a party having the right of trial by jury, the trial *de novo* shall include a jury, and a jury trial fee shall be paid as provided by law.

(D) After a written Notice of Appeal and Request for Trial *De Novo* has been filed and served, it may not be withdrawn except by stipulation of all remaining parties or by order of the Arbitration Judge.... In the event a Notice of Appeal and Request for Trial *De Novo* is withdrawn pursuant to this rule and no other Notice of Appeal and Request for Trial *De Novo* remains, judgment shall be entered in accordance with Rule 21.

lar, the intoxication of Plaintiff and his disregard for his own safety by venturing out into the roadway without checking for traffic, are factor [sic] which Defendant believes will place liability primarily, if not exclusively, on Plaintiff. Defendant is aware that Plaintiff has retained an accident reconstructionist who is expected to testify that Defendant should have had an adequate opportunity to avoid striking Plaintiff. Despite this opinion, Defendant believes that the expert's opinion lacks a substantial factual basis, does not fully consider the facts of the case and may be based upon an examination of a changed accident scene, especially with regard to the level of lighting at the scene.

. . . .

## XI. *STATUS OF SETTLEMENT*

*Due to Defendant's position on liability and the negligence of Plaintiff, Defendant has not made an offer to settle this action, except to allow Plaintiff to dismiss his action against Defendant, with each party to bear their own costs.*

(Emphasis added.)

In his March 8, 1999 Settlement Conference Statement, Plaintiff maintained that "Defendant failed to keep a proper lookout and failed to control his motor vehicle so as to avoid the accident." Additionally, Plaintiff explained the status of settlement negotiations as follows:

Defendant appealed the arbitration award without having made an offer prior thereto. Defendant has made no offers.

By letter dated September 9, 1998 Plaintiff's counsel indicated that he would recommend a $25,000.00 general damages only settlement. *There was no response to that offer other than he indicated the case was going to trial.* There is a $100,000.00 policy. Given that the special damages are $21,000.00 and that some award is going to be made for general damages even if the apportioned negligence is 50/50 there would still be some recovery to the Plaintiff. Plaintiff has made it clear that if

Defendant does not improve its position by 30% that Plaintiff will seek the sanctions available under the CAAP provisions.

(Emphasis added.)

The April 9, 1999 settlement conference was reset for April 29, 1999, and at the conference,[6] the circuit court apparently ordered the parties to participate in mediation. The circuit court also reset trial for June 21, 1999 and scheduled a second settlement conference for May 27, 1999, which conference was thereafter apparently continued to June 18, 1999.

At the outset of the June 18, 1999 settlement conference, which both Defendant and his attorney attended, the following exchange took place:

THE COURT: ... *I understand the defense's position still is that they will make no offer or no offer of any money in this case.*

[DEFENDANT'S COUNSEL]: Your Honor, to make the record extremely clear, *[Defendant's] offer at this time is that we would be willing to allow [Plaintiff] to withdraw their [sic] claims against [Defendant], each party to bear their own costs.*

THE COURT: I take that as not acceptable to [Plaintiff].

[PLAINTIFF'S COUNSEL]: That's correct, your Honor.

THE COURT: This is the second settlement conference that we've had at this time. Another one was several—maybe two or three weeks ago. I don't remember the exact date.

And I think that the first time that there had been a written settlement response from [Defendant] was yesterday.

[PLAINTIFF'S COUNSEL]: *I received a letter from [Defendant's counsel] dated June 17th saying, for the first time in writing, in terms of the settlement letter that there would be no offer and that he would allow—just as he said today. He had previously expressed these things to*

6. The transcripts of the April 29, 1999 settlement conference are not included in the record on appeal.

*me verbally at the last settlement conference.*

THE COURT: Okay. Well, the purpose of the settlement conference is to try to see if we can dispose of cases without the necessity of utilizing trial time, which is, of course, a finite public resource here in [the circuit court].

We had last year 1,100 civil cases filed, 850 felony criminal indictments. So around 2000 matters each year for trial by three judges. We actually do 120 to 150 trials a year.

And of course our mission is to resolve disputes in an expeditious and fair manner for the general good of the community and the State.

In order to do that, we're given certain tools of management to manage this public resource, one of which is [RCCH] Rule 12.1, which we're operating under here today, and which requires the parties to do certain things in connection with an attempt to try to reach a fair resolution of the dispute by settlement.

And one of those things is to make—to negotiate a settlement or at least try through the exchange of written, bonafide and reasonable offers of settlement prior to meeting in the settlement conference. And so what the [c]ourt is faced with here is that [sic] being done in this case.

(Emphases added.)

Thereafter, the circuit court, with no disagreement by the parties, described its understanding of the material facts underlying this case:

[T]here was an accident on June 20th, 1997 about 10:00 p.m. on Kamehameha Avenue in Kahului in which [Plaintiff,] who was— admits he was intoxicated, walked into the middle of Kamehameha Avenue because he believed he saw a quarter out there and wanted to pick it up, doesn't recall looking for cars.

He walked into the middle of the road, bent over and was hit by an automobile driven by [Defendant]. Plaintiff, I guess, admits he was wearing dark clothing.

[Defendant], on the other hand, admits that he saw [Plaintiff] in the road just before he hit him. He did not sound his horn or take evasive action except he tried to swerve to the left. He did not brake until after impact.

I guess it's not quite clear whether there were any street lights in the vicinity, but the headlights of the car were working.

... Harry Kruper, who is the only expert identified in this case, was identified by [Plaintiff] as an accident reconstruction expert, and would testify that according to his report, that if there was [sic] street lights, there would have been sufficient illumination over and above any head lights for a pedestrian to be seen.

However, even if there was [sic] no street lights, the headlight illumination for this car should have still been sufficient for perception and reaction and braking and considering 150 foot capability for the driver to see dark, unreflectorized objects on the roadway with the new headlights even at 30 miles an hour, and considering the perception and reaction time, if the driver had been alert, the driver should have been able to avoid the accident.

His deposition has apparently not been taken by [Defendant], and discovery is closed.

Based on these undisputed facts, the circuit court orally made the following findings:

[T]he [c]ourt believes that a fair-minded jury would find liability—I guess the [CAAP] arbitrator found a 65/35 ratio. [Defendant] being 65 percent negligent.

I think that's a fair approximation. Based on the facts, as I understand them, a reasonable-minded jury would find that.

Given that, the damages requested here are special medical damages of $21,551.79. [Plaintiff's] demand for settlement has been $25,000. And *the offer, as already mentioned, has been zero, no offer.*

*Under those circumstances, where there's at least a fair likelihood of liability, the [c]ourt believes that there should be a settlement offer.*

*Otherwise the rule means nothing, and [Defendant] would only be motivated to make an offer if it felt that there was close to 100 percent chance of liability.*

In any case and under those circumstances, when Rule 12.1 is not useful to try to effectuate settlement, the [c]ourt does not feel that is the better view, nor the one that the [s]upreme [c]ourt intended in adopting these rulings.

*Therefore, the [c]ourt finds that a reasonable jury verdict would be likely in the range of 65/35. And finds that the failure of [Defendant] in this case to make any offer is a violation of [R]ule 12.1(a) of its obligation to make a written, bonafide and reasonable offer of settlement.* And will impose sanctions under Rule 12.1–6 as follows:

Order them in default, [Defendant], on the issue of liability. And I'll order the payment by [Defendant] of attorney's [sic] fees and costs for the first settlement conference in this case.

(Emphases added.) The circuit court then gave the attorneys an opportunity to speak. Defendant's counsel explained why a monetary settlement had not been offered:

First of all, if I may supplement the record, throughout this case even before the lawsuit was filed, the position of the parties has been as it is today, your Honor.

That [Defendant] was not liable for the—or negligent for the proximate cause of any injury of [P]laintiff.

That was the position as stated today. It was stated even before the suit was filed. It was stated after suit was filed. It was stated prior to [CAAP] arbitration in this matter. It was also the same position after the [CAAP] arbitration in this matter.

It was this very same position coming up in pretrial also stated in our written settlement conference statement, your Honor.

At no time has [Defendant] communicated to [P]laintiff any other position except no liability, and that no offer of a monetary settlement would be made on this case based on the facts of this case.

So, your Honor, to the extent that we have not complied with the letter of the law of [Rule] 12.1, I believe, your Honor, even if the [c]ourt considers our last communication with [Plaintiff's counsel] yesterday in which we verified, once again, per-

haps for the seventh or eighth time, that again [Defendant's] position would be a defense—seeking a defense on liability.

So there's been no withholding of our position or waffling or nondisclosure of what [Defendant's] position has been. We respectfully disagree with the [c]ourt's interpretation of the facts and finding [sic] that a jury would find a 65/35 liability split as did the [CAAP] arbitrator. We believe that's a matter for the trier of fact in this case.

Frankly, your Honor, we believe, given our position, that the more likely outcome would be that a like-minded jury would find that the bulk of the liability, if not all of the liability, rests with [P]laintiff based on the [c]ourt's own recitation of the perceived facts in this matter.

To that extent, your Honor, we strongly object to the imposition of the sanctions. Also as to the summarial [sic] order of default on my client of liability which we also strenuously object to that position as well.

The circuit court then directed Plaintiff's counsel to draft the order and scheduled trial for September 7, 1999.

On July 9, 1999, the circuit court filed a written Order Imposing Sanctions (sanction order), which provided:

1. The court finds that Defendant and his counsel have not complied with their obligations under [RCCH] Rule 12.1(a) . . . by failing to thoroughly evaluate the case and discuss and attempt to negotiate a settlement and to an exchange [sic] a written bona fide and reasonable offer of settlement prior to the settlement conference which occurred in this case.

2. The court believes that under the undisputed facts of this case the jury would determine a verdict in favor of Plaintiff and against Defendant and that an appropriate allocation of fault between Plaintiff and Defendant is 35% Plaintiff and 65% Defendant as determined by the arbitrator in this case.

3. Pursuant to [RCCH] Rule 12.1(a)(6) . . . the court is imposing the sanction upon Defendant of entering a default against

[Defendant] on the issue of liability and determines the apportionment of fault at 65% Defendant and 35% Plaintiff and in awarding Plaintiff attorneys' fees and costs for appearing at the settlement conference which occurred in this case on May 27, 1999. Plaintiff's counsel should submit an affidavit setting forth his time and any costs incurred for that settlement conference.

The order also reset trial for September 7, 1999 "on the sole issue of Plaintiff's damages."

■ Following a trial held on September 7 and 8, 1999, the jury returned a special verdict, awarding Plaintiff $24,509.27 in special damages and $45,000.00 in general damages, for a total of $69,509.27 in damages. On September 17, 1999, judgment was entered against Defendant for $45,181.03 (sixty-five percent of the total award). On September 23, 1999, Plaintiff filed two motions which sought taxation of costs, prejudgment interest, and the imposition of sanctions, including attorney fees and the cost of the jurors, against Defendant. On September 27, 1999, Defendant filed a notice of appeal. On November 2, 1999, the circuit court entered an order[7] awarding Plaintiff costs totaling $3,646.17, attorney fees in the amount of $10,000.00, and prejudgment interest from August 21, 1998, the date of the arbitration award, to September 17, 1999, the date of the judgment. Defendant filed a Second Amended Notice of Appeal on November 18, 1999.

## DISCUSSION

### A. The Sanctions Order

■■ An award of RCCH Rule 12.1 sanctions is reviewed on appeal under the abuse of discretion standard. *Canalez v. Bob's Appliance Serv. Ctr., Inc.*, 89 Hawai'i 292, 300, 972 P.2d 295, 303 (1999). A "trial court abuses its discretion if it bases its ruling on

an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Id.* at 299, 972 P.2d at 302 (internal quotation marks omitted). Stated otherwise, "an abuse of discretion occurs where the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Id.* (internal quotation marks and brackets omitted).

For the reasons that follow, we conclude that the circuit court premised its sanctions order on an erroneous view and application of the law and, accordingly, abused its discretion in entering the order.

1. *The Requirements for Imposing Sanctions on Defendant Were Not Present in This Case*

The circuit court issued its sanctions order pursuant to Rule 12.1 of the RCCH, which provides, in relevant part:

**(a) Settlement Conference.** A settlement conference may be ordered by the court at any time before trial. Any party may also file a request for settlement conference at any time prior to trial. A settlement conference in civil cases shall be subject to the following guidelines:

(1) If a party settles or otherwise disposes of any action prior to a scheduled settlement conference, the party shall immediately notify the judge who scheduled the conference;

(2) Each party to the action shall attend the conference or be represented by an attorney or other representative who has authority to settle the case;

(3) For each party represented by counsel an attorney who is assigned to try the case shall attend the settlement conference. It is expected that the attorney will have become familiar with all aspects of the case prior to the conference;

---

7. Under the Hawai'i Rules of Appellate Procedure in effect at the time Defendant–Appellant Garth Kaaea (Defendant) filed his notice of appeal on September 27, 1999, the Circuit Court of the Second Circuit lost its jurisdiction to enter an order on Plaintiff's motions for taxation of costs, prejudgment interest, and imposition of sanctions, once Defendant filed his notice of appeal.

*See Hoddick, Reinwald, O'Connor & Marrack v. Lotsof*, 6 Haw.App. 296, 300, 719 P.2d 1107, 1111 (1986). Accordingly, the November 2, 1999 "Order on Plaintiff's Motion for Taxation of Costs and Prejudgment Interest and Plaintiff's Motion for Imposition of Sanctions Against Defendant" is void.

(4) *Each party to the action shall have thoroughly evaluated the case and shall have discussed and attempted to negotiate a settlement through an exchange of written bona fide and reasonable offers of settlement prior to the conference;*

(5) The judge conducting the settlement conference may, at the conclusion of said conference, continue said conference to another time and date, and from time to time thereafter for continued settlement negotiations if he has reason to believe a settlement can thereby be effectuated;

(6) *Sanctions. The failure of a party or his [or her] attorney to appear at a scheduled settlement conference, the neglect of a party or his [or her] attorney to discuss or attempt to negotiate a settlement prior to the conference, or the failure of a party to have a person authorized to settle the case present at the conference shall, unless a good cause for such failure or neglect is shown, be deemed an undue interference with orderly procedures. As sanctions, the court may, in its discretion:*

(i) Dismiss the action on its own motion, or on the motion of any party or *hold a party in default,* as the case may be;

(ii) Order a party to pay the opposing party's reasonable expenses and attorneys' fees;

(iii) Order a change in the calendar status of the action;

(iv) Impose any other sanction as may be appropriate.

(Emphases added.)

The Hawai'i Supreme Court has stated that the "apparent purpose" of clause (4) of RCCH Rule 12.1(a) "is to ensure that the dispute resolution opportunity generated by the settlement conference mechanism is meaningful. As such, a failure to abide by the requirements of [RCCH] Rule 12.1(a)(4), absent good cause shown, is sanctionable under [RCCH] Rule 12.1(a)(6), as an undue interference with orderly procedures." *Canalez,* 89 Hawai'i at 304, 972 P.2d at 307 (internal quotation marks omitted).

██ Pursuant to clause (6) of RCCH Rule 12.1(a), one of three conditions must be present to trigger the imposition of sanc-

tions: (1) a party or his or her attorney must fail to appear at a scheduled settlement conference; (2) a party or his or her attorney must neglect to discuss or attempt to negotiate a settlement prior to the conference; or (3) a party must fail to have a person authorized to settle the case present at the conference. None of these conditions was present in this case.

As to the first condition, the record reflects that Defendant's attorney attended all settlement conferences scheduled by the circuit court. As to the second condition, the record indicates that by the time the June 18, 1999 settlement conference was held, Defendant had made it quite clear to both Plaintiff and the circuit court that although he was agreeable to a walk-away settlement whereby Plaintiff would dismiss the case with each party bearing his own costs, Defendant was not agreeable to offering a monetary settlement to Plaintiff. Defendant had communicated his settlement position and intent to seek a defense verdict in a March 3, 1999 Settlement Conference Statement, a March 15, 1999 letter responding to a letter from Plaintiff's counsel, a memorandum submitted to the court-appointed mediator, a June 17, 1999 letter, and in discussions between Plaintiff's counsel and Defendant's counsel. As to the third condition, the transcripts of the June 18, 1999 settlement conference reveal that Defendant, who had complete settlement authority in this case, was physically present with his attorney at the conference which resulted in the circuit court's imposition of sanctions against Defendant.

Since none of the conditions for imposition of sanctions under RCCH Rule 12.1(a)(6) were present in this case, and we are unaware of any provision that authorizes a trial judge to sanction a party for *failing to make a monetary settlement offer,* we conclude that the circuit court abused its discretion in entering the RCCH Rule 12.1 sanctions order against Defendant.

2. *The Circuit Court Abused Its Discretion in Entering the Default Liability Sanction*

██ Even if the circuit court were authorized to enter sanctions against Defendant,

we conclude that the default liability sanction imposed by the circuit court constituted an abuse of discretion.

### a.

Although this court has held that pursuant to RCCH Rule 12.1, a representative of a party with complete settlement authority can be compelled to physically attend and participate in a pretrial settlement conference, *Gump v. Walmart Stores, Inc.*, 93 Hawai'i 428, 453, 5 P.3d 418, 443 (App.1999), *aff'd in part, rev'd in part*, 93 Hawai'i 417, 5 P.3d 407 (2000), (upholding an order sanctioning defendant Wal–Mart Stores, Inc. (Wal–Mart) to pay $175.00 to plaintiff's counsel for the hour he spent attending a settlement conference that was "wholly non-productive" because a representative of Wal–Mart with complete settlement authority was not present), no Hawai'i appellate court has yet addressed whether a party can be compelled to make a monetary settlement offer and sanctioned for failing to do so.

In other jurisdictions, courts generally recognize that a litigant may not be sanctioned for failing to settle a case. In *Kothe v. Smith*, 771 F.2d 667 (2d Cir.1985), for example, the Second Circuit Court of Appeals held that the district court abused its sanction power when it directed a doctor defendant in a medical malpractice suit to pay $1,000.00 to the plaintiff's attorney, $1,000.00 to the plaintiff's medical witness, and $480.00 to the clerk of the court, as a penalty for failing to settle the case as the court had urged. The court reasoned as follows:

> Although the law favors the voluntary settlement of civil suits, it does not sanction efforts by trial judges to effect settlements through coercion. In [*Wolff v. Laverne, Inc.*, 17 A.D.2d 213, 233 N.Y.S.2d 555 (1962)], cited with approval in [*Del Rio v. Northern Blower Co.*, 574 F.2d 23, 26 (1st Cir.1978)], the [c]ourt said:

> > We view with disfavor all pressure tactics whether directly or obliquely, to coerce settlement by litigants and their counsel. Failure to concur in what the Justice presiding may consider an adequate settlement should not result in an imposition upon a litigant or his [or her]

counsel, who reject it, of any retributive sanctions not specifically authorized by law.

> In short, pressure tactics to coerce settlement simply are not permissible. "The judge must not compel agreement by arbitrary use of his [or her] power and the attorney must not meekly submit to a judge's suggestion, though it be strongly urged."

*Id.* at 669 (citations omitted). *See also In re Ashcroft*, 888 F.2d 546, 547 (8th Cir.1989) ("[p]retrial-conference discussion of settlement is designed to encourage and facilitate settlement as early as possible, but it is not designed to impose settlement upon unwilling litigants"); *National Ass'n of Gov't Employees, Inc. v. National Fed'n of Fed. Employees*, 844 F.2d 216, 223 (5th Cir.1988) ("[f]ailure to compromise a case, ... even pursuant to terms suggested by the court, does not constitute grounds for imposing sanctions"); *Sigala v. Anaheim City School Dist.*, 15 Cal. App.4th 661, 669, 19 Cal.Rptr.2d 38, 41 (1993) ("[a] court may not compel a litigant to settle"); *Halaby, McCrea & Cross v. Hoffman*, 831 P.2d 902, 908 (Colo.1992) ("[a]n 'adequate' amount of settlement authority will vary based on the circumstances of each case, and a settlement conference judge should not impose sanctions because, in his [or her] opinion, the amount is insufficient").

Courts have also struck down sanctions imposed by a trial court for failure of a party to make a settlement offer. In *Dawson v. United States*, 68 F.3d 886 (5th Cir.1995), for example, a federal district court sanctioned two assistant United States attorneys for failing to "make a settlement offer commensurate with the party's litigation exposure[,]" pursuant to a local rule that provided that "[t]he parties in every civil action must make a good-faith effort to settle[.]" *Id.* at 888. Although the district court acknowledged that it had no power to coerce a settlement, it maintained that it had "the power to coerce compliance with the 'good faith effort to settle' and 'settlement negotiations' requirements of the Local Rule which ... it interpreted as requiring that ... a monetary settlement offer should have been made." 68 F.3d at 897. Disagreeing with the district

court, the Fifth Circuit Court of Appeals held:

Although we applaud the district court's efforts to encourage and facilitate settlements, we conclude, as also discussed *infra*, that it abused its discretion by interpreting the rule to require, for this action, making a settlement offer as part of a good-faith effort to settle.

Obviously, there is no meaningful difference between coercion of an offer and coercion of a settlement: if a party is forced to make a settlement offer because of the threat of sanctions, and the offer is accepted, a settlement has been achieved through coercion. Such a result cannot be tolerated. . . .

Early settlement of cases is an extremely laudable goal, which federal judges have considerable power to encourage and facilitate, . . . and which is essential to controlling the overcrowded dockets of our courts. And, we commend the district court for its concern for protecting *pro se* plaintiffs' (particularly *pro se* prisoners') rights. On the other hand, as the district court acknowledged, parties may have valid and principled reasons for not wishing to settle particular cases. These reasons may not be based necessarily on the merits of a particular case, or the party's possible exposure in it, but because of the effect that a settlement might have on other pending or threatened litigation.

Here, two of the Government's numerous (and, it seems, very valid) reasons for not making a monetary offer were because [the plaintiff] was ... a *pro se* prisoner who had not shown much interest in prosecuting his claims, and because of the concomitant (and most legitimate) concern that settlement might encourage other prisoners to file frivolous lawsuits in the hopes of recovering a "nuisance value" settlement. It goes without saying that courts, among other entities, provide recourse for *pro se* prisoners, just as they do for other litigants; but, a plaintiff's status as a prisoner, *pro se* or otherwise, is a legitimate factor for the opposing party to consider in determining whether to make a settlement offer. In light of the increasing

flood of prisoner litigation that threatens to submerge our courts, such a factor is extremely relevant, especially when the Government is the defendant and the taxpayers will be footing the bill for any settlement.

*Id.* at 897–98.

In *Henry v. Prusak,* 229 Mich.App. 162, 582 N.W.2d 193 (1998), the Michigan Court of Appeals concluded that the entry of a default against the owner and driver of a vehicle "solely on the basis of a nonparty insurance carrier's refusal to make a settlement offer" deprived the owner and driver of "due process, the right to assert a defense, and the right to have a jury determine any disputed issues of fact." *Id.* at 196. The court reasoned as follows:

A court cannot "force" settlements upon parties. The practical effect of [the trial judge's] sanction of default against a party whose insurance carrier's representative refuses to make an offer to pay money is to force settlement. While we certainly encourage settlement negotiations as an essential and necessary tool for the resolution of disputes and docket control in congested courts, we cannot tolerate the routine practice of entering a default against a party for failure of the party's insurance carrier to make an offer of settlement.

*Id.* (citation omitted).

In *Richardson v. Sport Shinko (Waikiki Corp.),* 76 Hawai'i 494, 513, 880 P.2d 169, 191 (1994), the Hawai'i Supreme Court recognized that the imposition of sanctions under HAR Rule 26 may implicate a party's right to a civil jury trial under Article I, § 13 of the Hawai'i Constitution, which provides, in relevant part: "In suits at common law where the value in controversy shall exceed five thousand dollars, the right of trial by jury shall be preserved." The plaintiffs in *Richardson* had filed a request for trial *de novo* after being awarded over $60,000.00 by a CAAP arbitrator. After the jury returned a zero-damages defense verdict, the trial court sanctioned the plaintiffs by ordering them to pay the defendant $5,000.00 in attorney fees and $24.00 in costs, the maximum sanction that could then be imposed under HAR Rule 26. Although the supreme court held that

the trial court did not abuse its discretion in imposing the sanctions in that case, the supreme court also recognized:

> [A]lthough the amount of sanctions authorized by HAR [Rule] 26 is not *per se* unconstitutional, "the problem is one of degree rather than kind." *Christie–Lambert [Van & Storage Co. v. McLeod,* 39 Wash.App. 298, 307], 693 P.2d [161, 167 (1984)]. For example, as the Pennsylvania Supreme Court has noted with regard to a court rule requiring the payment of arbitrators' fees as a condition to post-arbitration jury trial:
>
>> The necessity of paying $75 in arbitrators' fees as the condition for the right to appeal from a mandatory arbitration award would seemingly operate as a strong deterrent, amounting practically to a denial of that right, if the case should involve only as little as $250.
>
> *Application of Smith,* 381 Pa. [223, 232], 112 A.2d [625, 630 (1955)]. Thus, the amount of sanctions imposed in a given case must not be so disproportionate to the amount in controversy so as to operate as a practical denial of the right to a jury trial in civil cases.

8.  HAR Rule 25, entitled "The Prevailing Party in the Trial *De Novo;* Costs[,]" provides:
    (A) The "Prevailing Party" in a trial *de novo* is the party who (1) appealed and improved upon the arbitration award by 30% or more, or (2) did not appeal and the appealing party failed to improve upon the arbitration award by 30% or more. For the purpose of this rule, "improve" or "improved" means to increase the award for a plaintiff or to decrease the award for the defendant.
    (B) The "Prevailing Party" under these rules, as defined above, is deemed the prevailing party under any statute or rule of court. As such, the prevailing party is entitled to costs of trial and all other remedies as provided by law, unless the [c]ourt otherwise directs.

9.  HAR Rule 26, entitled "Sanctions for Failing to Prevail in the Trial *De Novo* [,]" states:
    (A) After the verdict is received and filed, or the court's decision rendered in a trial *de novo,* the trial court may, in its discretion, impose sanctions, as set forth below, against the non-prevailing party whose appeal resulted in the trial *de novo.*
    (B) The sanctions available to the court are as follows:
    (1) Reasonable costs and fees (other than attorneys' fees) actually incurred by the party

*Richardson,* 76 Hawai'i at 515, 880 P.2d at 190 (internal brackets and ellipsis omitted).

In the present case, the circuit court disagreed with Defendant about the merits of his defense. While Defendant maintained that Plaintiff's negligence and intoxication were the primary cause of Plaintiff's injuries, the circuit court's assessment was that there was "at least a fair likelihood of liability" and therefore "there should be a settlement offer." In appealing the CAAP arbitrator's award and requesting a trial *de novo,* Defendant was already subject to sanctions if he failed to improve upon the arbitration award by 30 percent or more. HAR Rules 25 [8] and 26.[9] By entering an order of default against Defendant on the issue of liability simply because Defendant refused to make an offer of monetary settlement, the circuit court deprived Defendant not only of his right to a trial *de novo* to appeal the CAAP arbitration award but also of his constitutional right to have the liability issue determined by a jury.[10]

### b.

A default rendered pursuant to RCCH Rule 12.1(a)(6)(i) is not conceptually different from defaults rendered generally,[11] *Kam Fui*

but not otherwise taxable under the law, including but not limited to, expert witness fees, travel costs, and deposition costs;
    (2) Costs of jurors;
    (3) Attorneys' fees not to exceed $15,000;
    (C) Sanctions imposed against a plaintiff will be deducted from any judgment rendered at trial. If the plaintiff does not receive a judgment in his or her favor or the judgment is insufficient to pay the sanctions, the plaintiff will pay the amount of the deficiency. Sanctions imposed against a defendant will be added to any judgment rendered at trial.
    (D) In determining sanctions, if any, the [c]ourt shall consider all the facts and circumstances of the case and the intent and purpose of the Program in the State of Hawai'i.

10. Since Plaintiff's lawsuit alleged a common law negligence claim against Defendant seeking damages exceeding $5,000.00, Plaintiff was clearly entitled, under the state constitution to a jury trial. We express no opinion as to whether a right to a jury trial exists for other tort actions that are subject to the CAAP.

11. In *Kam Fui Trust,* the sanction of default was entered because the appellants "were not present and failed to attend the Scheduling [sic] Confer-

*Trust v. Brandhorst,* 77 Hawai'i 320, 325, 884 P.2d 383, 388 (App.1994), and the Hawai'i Supreme Court has emphasized that "defaults and default judgments are not favored and that any doubt should be resolved in favor of the party seeking relief, so that, in the interests of justice, there can be a full trial on the merits." *BDM, Inc. v. Sageco, Inc.,* 57 Haw. 73, 76, 549 P.2d 1147, 1150 (1976). In *W.H. Shipman, Ltd. v. Hawaiian Holiday Macadamia Nut Co.,* 8 Haw.App. 354, 802 P.2d 1203 (1990), this court stated that the "drastic sanctions of dismissal and default judgment are authorized only in extreme circumstances." *Id.* at 361, 802 P.2d at 1207 (internal brackets and quotation marks omitted). We also held that the appropriateness of a trial court's sanctions order should be determined by weighing the following five factors, which the Ninth Circuit Court of Appeals considers in evaluating the propriety of default or dismissal sanctions orders:

(1) the public's interest in the expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.

*Id.* at 362, 802 P.2d at 1207 (quoting *United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co.,* 857 F.2d 600, 603 (9th Cir.1988)) (internal quotation marks omitted).

■ Applying the foregoing test, we note, as to the first two factors, that the circuit court's default liability sanction did not expedite resolution of litigation or assist the court in docket management since the case still went to trial on the amount of damages. Regarding the third factor, we conclude that Defendant was clearly prejudiced by the default liability sanction since he was precluded from having a jury determine his liability or the extent of his liability. The fourth factor, the public policy of allowing cases to be decided on the merits, weighs heavily in favor of Defendant and against the imposition of default, particularly since questions of comparative negligence were involved in this case. Finally, assuming that Defendant's conduct was sanctionable, there were clearly less drastic sanctions that the circuit court could have imposed on Defendant under RCCH Rule 12.1(a)(6).

### 3. *The Circuit Court Abused Its Discretion in Entering the Apportionment Sanction*

■ In entering its sanctions order against Defendant, the circuit court found as follows:

2. The court believes that under the undisputed facts of this case the jury would determine a verdict in favor of Plaintiff and against Defendant and that an appropriate allocation of fault between Plaintiff and Defendant is 35% Plaintiff and 65% Defendant *as determined by the arbitrator in this case.*

It is expressly provided in HAR Rule 23, however, that once a party files a notice of appeal from a CAAP award and requests a trial *de novo,* the arbitration award must be sealed:

(A) *The clerk shall seal any arbitration award if a trial de novo is requested.* The jury will not be informed of the arbitration proceeding, the award, or about any other aspect of the arbitration proceeding. *The sealed arbitration award shall not be opened* until after the verdict is received and filed in a jury trial, or *until after the judge has rendered a decision in a court trial.*

. . . .

(C) No statements or testimony made in the course of the arbitration hearing shall be admissible in evidence for any purpose in the trial *de novo.*

(Emphases added.) This court has construed the foregoing rule as requiring that

[a]n arbitration award cannot be publicly disclosed until the trial *de novo* is completed, HAR Rule 23(A); and then only for the purpose of determining what sanctions

---

ence, either in person or through counsel[.]" *Kam Fui Trust v. Brandhorst,* 77 Hawai'i 320, 324 n. 1, 884 P.2d 383, 387 n. 1 (App.1994) (internal quotation marks omitted, reference to "sic" in original). Because the appellants failed to make a motion to set aside the default, we concluded that they lacked standing to challenge the issue of liability.

should be awarded against a non-prevailing party under HAR Rule 25 and Rule 26.

*Darcy v. Lolohea,* 77 Hawai'i 422, 427–28, 886 P.2d 759, 764–65 (App.1994), *cert. denied,* 77 Hawai'i 489, 889 P.2d 66 (1994) (footnotes omitted).

In light of the plain and unambiguous language of HAR Rule 23(a), the circuit court clearly abused its discretion when it sanctioned Defendant by apportioning his and Plaintiff's negligence based on the arbitrator's award. The apportionment sanction also deprived Defendant of a jury determination as to the degree of negligence of the parties, a patent violation of HRS § 663–31, which provides, in relevant part, as follows:

> **Contributory negligence no bar; comparative negligence; findings of fact and special verdicts.** (a) Contributory negligence shall not bar recovery in any action by any person ... to recover damages for negligence resulting in death or in injury to person or property, if such negligence was not greater than the negligence of the person or in the case of more than one person, the aggregate negligence of such persons against whom recovery is sought, but any damages allowed shall be diminished in proportion to the amount of negligence attributable to the person for whose injury, damage or death recovery is made.
>
> (b) *In any action to which subsection (a) of this section applies,* the court, in a nonjury trial, shall make findings of fact or, in a jury trial, *the jury shall return a special verdict which shall state:*
>
> (1) *The amount of damages which would have been recoverable if there had been no contributory negligence; and*
>
> (2) *The degree of negligence of each party, expressed as a percentage.*

(Emphases added.)

In his answering brief, Plaintiff states that "[i]t is not uncommon for judges during settlement conferences to inquire about what occurred during the arbitration process. That information provides the court with valuable insight as to whether a party has done a reasonable and thorough settlement evaluation." If Plaintiff's representation is

true, we urge that the practice be ceased immediately.

### B. *Dr. Ferrier's Testimony*

■ Defendant contends that the circuit court erred in allowing Dr. Ferrier to testify at trial as to the medical expenses incurred by Plaintiff. Defendant points out that in Dr. Ferrier's answers to interrogatories, which were never supplemented, Dr. Ferrier never indicated that he would render an opinion on Plaintiff's medical expenses.

Since the record on appeal includes neither the interrogatories propounded to Dr. Ferrier nor Dr. Ferrier's answers to the interrogatories, it is impossible for us to determine the merits of Defendant's contention.

### C. *The Tort Threshold Requirement*

The final argument raised by Defendant on appeal is that the circuit court should have granted his motion for directed verdict because Plaintiff failed to adduce expert testimony as to the reasonableness and necessity of Plaintiff's claimed medical expenses and therefore failed to prove that Plaintiff's medical-rehabilitative expenses met the tort threshold requirements set forth in HRS § 431:10C–306.

In denying Defendant's motion for directed verdict, the circuit court stated that it had "already decided as a matter of sanction that [Defendant was] responsible here, and subsumed within that decision is any prima facie requirement" to establish the reasonableness and necessity of Plaintiff's medical expenses. Since the circuit court's denial of the directed verdict motion was premised on the sanctions order, which we have concluded was improperly entered, we vacate the order denying Defendant's motion for directed verdict.

### CONCLUSION

In light of the foregoing discussion, we vacate: (1) the Order Imposing Sanctions, entered by the circuit court on July 9, 1999; (2) the Judgment, entered by the circuit court on September 17, 1999; and (3) the circuit court's oral order, announced on September 8, 1999, denying Defendant's motion for directed verdict. We remand this case

for a new trial that complies with the guide-lines set forth in this opinion.